No. ________

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**META PLATFORMS, INC.,**

*Petitioner-Defendant,*

v.

**DZ RESERVE AND CAIN MAXWELL D/B/A MAX MARTIALIS,**

*Respondents-Plaintiffs.*

On Petition for Permission to Appeal from the United States District Court for the Northern District of California, Case No. 3:18-cv-04978-JD
The Honorable James Donato

# PETITION FOR PERMISSION TO APPEAL CLASS CERTIFICATION DECISION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 23(f)


Elizabeth L. Deeley
Melanie M. Blunschi
Nicole C. Valco
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Samir Deger-Sen
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020

Andrew B. Clubok
Susan E. Engel
Margaret A. Upshaw
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
andrew.clubok@lw.com

*Counsel for Petitioner-Defendant Meta Platforms, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Petitioner-Defendant Meta Platforms, Inc. ("Meta") by and through its undersigned counsel, hereby certifies that Meta has no parent corporation, and no publicly held corporation owns 10% or more of its stock.


*/s/ Andrew B. Clubok*
Andrew B. Clubok
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200

*Counsel for Petitioner-Defendant Meta Platforms, Inc.*

## TABLE OF CONTENTS

**Page**


CORPORATE DISCLOSURE STATEMENT .......... i

TABLE OF AUTHORITIES .......... iii

QUESTION PRESENTED .......... 1

INTRODUCTION .......... 1

STATEMENT OF CASE .......... 4

REASONS FOR GRANTING THE PETITION .......... 12

I. THE DISTRICT COURT WRONGLY CERTIFIED A CLASS OF MILLIONS OF ADVERTISERS WHO ALL VIEWED DIFFERENT STATEMENTS .......... 12

II. THE DISTRICT COURT'S DECISION IMPLICATES A FUNDAMENTAL AND UNSETTLED QUESTION OF CLASS ACTION LAW .......... 21

III. FAILURE TO GRANT THIS PETITION WOULD BE THE DEATH-KNELL OF THIS LITIGATION .......... 25

CONCLUSION .......... 26

## TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amchem Products, Inc. v. Windsor*,
521 U.S. 591 (1997)....................3, 13

*Berger v. Home Depot USA, Inc.*,
741 F.3d 1061 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017) ....................14, 19

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005) ....................1, 2, 25

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)....................21

*dotStrategy, Co. v. Facebook, Inc.*,
No. 20-00170, 2021 WL 2550391 (N.D. Cal. June 22, 2021) ....................23

*Downey v. Public Storage, Inc.*,
44 Cal. App. 5th 1103 (2020) ....................16

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ....................15

*Engalla v. Permanente Medical Group, Inc.*,
15 Cal. 4th 951 (1997) ....................13, 16

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....................13

*In re First Alliance Mortgage Co.*,
471 F.3d 977 (9th Cir. 2006) ....................20

*IntegrityMessageBoards.com v. Facebook, Inc.*,
No. 18-cv-05286, 2021 WL 3771785 (N.D. Cal. Aug. 24, 2021) ....................18, 22, 23, 24

*Kaldenbach v. Mutual of Omaha Life Insurance Co.*,
178 Cal. App. 4th 830 (2009) ....................19

**Page(s)**

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310 (2011) .......... 16

*Mirkin v. Wasserman*,
5 Cal. 4th 1082 (1993) .......... 19

*Reitman v. Champion Petfoods USA, Inc.*,
830 F. App'x 880 (9th Cir. 2020) .......... 19

*Singh v. Google LLC*,
No. 16-cv-03734, 2022 WL 94985 (N.D. Cal. Jan. 10, 2022) .......... 18, 22, 23, 24

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) .......... 19

*Tucker v. Pacific Bell Mobile Services*,
208 Cal. App. 4th 201 (2012) .......... 13, 16

*Tyson Foods, Inc. v. Bouaphakeo*,
577 U.S. 442 (2016) .......... 13

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 25

## OTHER AUTHORITY

Fed. R. Civ. P. 23(b)(3) .......... 13

## QUESTION PRESENTED

Whether, under Federal Rule of Civil Procedure 23(b)(3)'s predominance requirement, a diverse class of millions of online advertisers may be certified for purposes of a fraudulent misrepresentation claim where each advertiser saw a concededly different statement.

## INTRODUCTION

This petition seeks interlocutory review of one of the largest certified classes of fraud claims in the history of this circuit, and raises questions of exceptional importance to the development of class action law in the context of online advertising. Advertiser class actions like this one are increasingly common, but district courts are fractured in determining whether and when such cases are suitable for class treatment. The decision below creates a square conflict in authority between district courts in this circuit over whether a class of diverse advertisers presented with different representations may nonetheless prove their fraud claims on a class-wide basis. The circumstances under which such claims may be pursued is an "unsettled and fundamental issue of law," on which this Court's guidance is badly needed. *Chamberlan v. Ford Motor Co*., 402 F.3d 952, 957-59 (9th Cir. 2005). And the district court's decision to break with the views of multiple other courts on the question presented was "manifestly erroneous," and will very likely "'sound[] the

death knell of the litigation.'" *Id.* at 957-58 (citation omitted). This Court's criteria for interlocutory review are thus easily satisfied. The petition should be granted.

This class action arises from representations Defendant Meta Platforms, Inc. allegedly made to its millions of disparate advertisers, regarding an estimate known as "Potential Reach." Potential Reach provides each advertiser with a unique numerical "estimate" of the potential size of the overall audience for an ad, based on individualized targeting criteria selected by the advertiser. Plaintiffs concede that advertisers have hundreds of thousands of targeting options on Facebook, and each advertiser received a *different* Potential Reach estimate for each ad they ran. The district court nonetheless permitted this sprawling group of millions to pursue their claims on a class-wide basis, on the premise that "Potential Reach was always expressed as a number of 'people,'" and, because some individuals allegedly created duplicate "accounts," the estimate was "an inaccurate representation of how many people the advertisements could reach." Order 10, ECF No. 388.

That was error. The liability inquiry in this case turns not on the common use of the word "people," but on the *degree* of "discrepancy" between "people" and "accounts" in each advertiser's unique Potential Reach estimate—which the district court agreed "varied across advertisers." *Id.* By describing something as an "estimate," a speaker already conveys that the number is not perfectly "[]accurate." *Id.* The relevant question for purposes of a fraud claim is whether an "estimate" is

*so* inaccurate as to be materially misleading, in light of the other information the recipient possesses. And the answer to *that* question turns on an individualized assessment of the particular representation each advertiser received, and the context in which they received it—which necessarily varies across advertisers.

That variation means that this case cannot be adjudicated through class-wide proof, consistent with Rule 23(b)(2)'s "demanding" predominance requirement. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). Whether an "estimate" that is off by 1 or 2% is materially misleading is a fundamentally different inquiry than whether an estimate inflated by 50% is materially misleading. Yet that is precisely the diverse array of statements that will be submitted to the jury, without any clear way of establishing falsity or materiality as to the entire class. That problem is only compounded by the substantial differences between the millions of advertisers in the class, who range from sole proprietors to small online businesses to multinational corporations, and who viewed different disclaimers, had different objectives, and had access to vastly different information and context for the estimates they saw. And, to make matters worse, Plaintiffs also lack any method of class-wide proof as to damages, because their only damages expert relating to the purported difference between "people" and "accounts" was excluded in the very order certifying the class. The district court erred by ignoring these fundamental defects, and nonetheless certifying the class.

The district court's decision breaks with multiple other decisions involving advertiser class actions from the last year alone, creating a conflict in authority within this circuit. That conflict is of exceptional importance, because class actions brought by online advertisers are a fast-growing category of putative class claims, and often involve millions of class members, seeking billions of dollars in damages. Whether, and in what circumstances, class actions challenging divergent representations made to disparate parties are suitable for class treatment is a recurring issue on which district courts are in dire need of this Court's guidance.

Finally, the district court's certification decision likely sounds the death-knell of this litigation. The district court certified a class of millions of advertisers, seeking *$7 billion* in damages. Given the extreme pressure to settle in the face of such an expansive class, interlocutory review is likely the only plausible path for this Court to review the certification decision. The district court's deeply misguided application of Rule 23's predominance requirement should not be the final word in a case of this magnitude. Instead, this Court should take the opportunity to bring much needed clarity to this important area of class action law.

## STATEMENT OF CASE

This case involves a class action lawsuit brought by two plaintiffs, on behalf of more than three million advertisers who purchased ads through Meta's self-service ads tool, Ads Manager. Plaintiffs allege that Meta intentionally inflated a

pre-campaign estimate called "Potential Reach," causing all advertisers to pay more for Meta ads than they otherwise would have.

"Potential Reach" is one of several planning tools Meta displays on Ads Manager to help advertisers target their ads to an interested audience. It is a numerical "*estimation* of how many people are in an ad set's target audience." Third Am. Compl. ¶ 36 & Figure 4, ECF No. 332 (emphasis added). But Potential Reach is "not an estimate of how many people will actually see [an advertiser's] ad." Class Cert. Opp. Ex. 78 at 13, ECF No. 296-15. Rather, that estimate is provided by a separate prediction called Estimated Daily Results, which is presented adjacent to Potential Reach and (unlike Potential Reach) takes into account adjustments to an advertiser's budget. *Id.* at 19. Accordingly, when creating an ad campaign, an advertiser sees the following interface with multiple estimates presented:




Mot. Summ. J. Ex. 1 at 30, ECF No. 375-1.

As shown above, Potential Reach is a number that bears little relation to the number of people who may actually view an ad over the course of the advertiser's campaign (which depends on the advertiser's budget and other factors). It is thus undisputed that many advertisers largely disregard Potential Reach, and instead look to Estimated Daily Results, which estimates the number of people that may see their ad in one day. *See generally* Blunschi Decl. Exs. A-J, ECF Nos. 296-1-10 (advertiser declarations); Tucker Rebuttal Expert Report ("Tucker") ¶¶ 69-72, ECF No. 288-1.[1] And advertisers also have access to other metrics, including the ad's actual results, which Meta provides in real time (allowing advertisers to contemporaneously adjust budgets based on actual ad performance). Tucker ¶¶ 8(e), 74-75.

Moreover, it is undisputed that the vast majority of advertisers do not focus on maximizing their "reach" (how many people see their ad) at all, but instead on "conversions," which produce more tangible results (like click-throughs). *See* Blunschi Decl. Ex. 134, ECF No. 296-71. In fact, Plaintiffs' own expert found that 21% of the class actually set *lower* budgets when the Potential Reach estimate was

[1] For example, one advertiser explained that she does "not use or rely on Potential Reach estimates" and that 10% inflation in Potential Reach "would have no effect on [her] advertising strategy or decisions." Lowe Decl. ¶ 7, ECF No. 296-1. Another stated that she "hardly look[s] at [Potential Reach]." L. Davis Decl. Ex. ¶ 6, ECF No. 296-6. And these advertisers stated that, to the extent they use Potential Reach at all, they use it only to select their targeting criteria, *not* to set their budgets. *See, e.g.*, Lowe Decl. ¶ 8; Flanders Decl. ¶ 10, ECF No. 296-2; McDowell Decl. ¶ 10, ECF No. 296-4; L. Davis Decl. ¶ 10.

higher, underscoring the different weight that different advertisers attached to the estimate. *See* Reibstein Rebuttal Expert Report ("Reibstein") ¶¶ 125-26, ECF No. 289-1.

Potential Reach estimates update in real time as an advertiser selects from hundreds of thousands of targeting and placement criteria, like demographics (*e.g.*, age, gender, location), interests (*e.g.*, dogs or the San Francisco 49ers), and where the ads should be shown (*e.g.*, Facebook, Instagram). *See* Tadelis Expert Rebuttal Report ("Tadelis") ¶¶ 31-32, ECF No. 298-1. Meta explains to advertisers that the "[e]stimates" are "based on the placements and targeting criteria [an advertiser] select[s] and include factors like Facebook user behaviors, user demographics and location data." Third Am. Compl. ¶ 35 & Figure 3. Meta also discloses that Potential Reach estimates are "not designed to match population or census estimates." *Id.* Meta's disclaimers regarding Potential Reach have evolved over time. In 2019, during the Class Period, Meta clarified that estimates "may differ" depending on "[h]ow many accounts are used per person," Blunschi Decl. Ex. 94 at 1, ECF No. 296-31, and Meta later added further disclosures regarding fake accounts. *See* Class Cert. Opp. 7 (describing changes to disclosures during Class Period).

Plaintiffs nonetheless allege that Meta misled advertisers (1) by presenting inflated Potential Reach estimates that exceeded the actual number of "people in an advertisement set's target audience," *see* Third Am. Compl. ¶ 143, and (2) by

presenting Potential Reach estimates in terms of "people," even though the estimates actually corresponded to "accounts" (including duplicate or fake accounts), rather than unique individuals, *see id.* ¶¶ 32, 68, 144.

As relevant here, Plaintiffs sought to certify a damages class for their common-law fraud claims. In their class certification motion, Plaintiffs argued their claims were suitable for class treatment because Meta's use of the term "people" instead of "accounts" was a uniform misrepresentation presented to all members of the class. *See* Class Cert. Mot. 14-15, 19, ECF No. 282. Additionally, according to their expert, Dr. Charles Cowan, Potential Reach estimates were "inflated by at least 10% . . . for all advertisement sets with a Potential Reach greater than 1,000." *Id.* at 4, 13-14. Plaintiffs contended that damages associated with the inflated numerical estimates could be calculated on a class-wide basis because inflated Potential Reach estimates purportedly resulted in larger advertiser budgets, raising prices across the board. *Id.* at 21. With respect to the "people" representation, Plaintiffs' damages model turned on the expert report of Bruce McFarlane, who purported to compare the price paid by Plaintiffs and class members with the price a reasonable consumer would have paid if Meta had not provided any Potential Reach estimate. *Id.* at 14, 22.

In response, Meta explained that class treatment was inappropriate because, among other things, Plaintiffs could not satisfy Rule 23(b)(3)'s predominance

requirement. In particular, Plaintiffs could not show common proof of falsity or materiality, because class members were not exposed to the same allegedly material misrepresentations. Rather, "Potential Reach estimates were all different," and "the particular criteria selected determined . . . whether [each Potential Reach estimate] was more or less accurate." Class Cert. Opp. 10, ECF No. 294. Meta's expert explained that Potential Reach estimates were not uniformly inflated, with alleged inflation of 3% or even lower for ad campaigns with more granular targeting criteria. *See* Tadelis ¶¶ 124-31 & Exs. 1-12. Meta also pointed out that the class varied along a number of other dimensions—including the disclaimers advertisers may have viewed, their objectives for a particular ad campaign, and the information they had access to. Class Cert. Opp. 12, 18-19. And, Meta explained, each advertiser was exposed to Potential Reach in a different context, with different Estimated Daily Results and varied other metrics they used in setting their advertising budgets. *Id.* at 6.

Additionally, Meta argued that Plaintiffs' "people"-versus-"accounts" theory could not be certified, because, as Meta explained in its *Daubert* motion, McFarlane's analysis was invalid. In particular, McFarlane's model was not the product of expert analysis, but was instead based on "observations" about Meta documents that a jury could evaluate itself. McFarlane *Daubert* at 2-6, ECF No. 286.

Meta also filed a request for an evidentiary hearing, explaining that there was

"conflicting expert evidence regarding the predominance requirement of Rule 23" and the court was therefore obligated to resolve the pertinent factual disputes in ruling on the class certification motion. Mot. for Evidentiary Hrg. 1-2, ECF No. 309. Meta pointed out that, contrary to Plaintiffs' expert analysis, Meta's expert had shown that any alleged "inflation" in Potential Reach was "non-existent or *de minimis*" for "most advertisers," and "specific to the particular targeting criteria an advertiser used," and Potential Reach appeared alongside varied metrics, such that the class was not exposed to a common misstatement. *Id.* at 3.

On March 29, 2022, without holding an evidentiary hearing or any other substantive hearing, the district court certified a class of over three million members. The court held that certification was warranted because "all class members were exposed to a similar representation about the ability of Potential Reach to reach 'people,' namely unique individuals." Order 10. At the same time, the district court acknowledged that it was "the *discrepancy* between people and accounts" that made the estimates "inaccurate," and "the numerical value of the inaccuracy"—*i.e.*, the degree of this discrepancy—"*varied* across advertisers." *Id.* (emphasis added).

With respect to materiality, the district court found it sufficient that "Potential Reach metrics were shown to all advertisers in the Ads Manager" and "Potential Reach is an important number for advertisers." *Id.* at 11. The court likewise found injury could be proven by common evidence because of the existence of *some*

inflation in the estimates. *Id.* The court recognized a dispute between the parties' experts as to the degree and uniformity of inflation across estimates, but deemed it immaterial, because Meta's expert "did not conclude that no inflation occurred at all." *Id.* at 11-12.

Finally, with respect to damages, the district court agreed with Meta that McFarlane's expert report should be excluded because it did not "offer any specialized or scientific expertise." *Id.* at 14. But the court concluded that Plaintiffs could nevertheless calculate damages on a class-wide basis using their other damages experts (*id.*), who had found there was no impact on advertising budgets when the word "people" was changed to "accounts."

## REASONS FOR GRANTING THE PETITION

### I. THE DISTRICT COURT WRONGLY CERTIFIED A CLASS OF MILLIONS OF ADVERTISERS WHO ALL VIEWED DIFFERENT STATEMENTS

The district court's unprecedented decision to certify a diverse class of millions of advertisers who were concededly exposed to *different* representations was manifest error. Whether each representation was materially misleading necessitates an individualized analysis of the discrepancy between "people" and "accounts" for *each advertiser's* unique Potential Reach estimate. That defeats predominance, and the district court's holding to the contrary contravenes well-established Supreme Court and Ninth Circuit precedent. As far as Meta is aware, *no*

court has certified a class alleging fraud claims where class members were exposed to statements that varied in the very aspect that was alleged to be deceptive. The district court's remarkable decision will have far-reaching consequences on class action law within this circuit, and demands immediate review.

Under Rule 23(b)(3), a damages class can be certified only where "questions of law or fact common to class members predominate over" individual questions. Fed. R. Civ. P. 23(b)(3). At its core, the predominance requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). The predominance inquiry begins "with the elements of the underlying cause of action," *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011), and each element must be "susceptible to generalized, class-wide proof," *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (citation omitted).

Accordingly, to establish that class treatment is appropriate for their fraud claims, Plaintiffs must show common proof of a misrepresentation upon which class members justifiably relied, and resulting damages. *See Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997); *Tucker v. Pac. Bell Mobile Servs.*, 208 Cal. App. 4th 201, 227-28 (2012) ("[I]f the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof . . . ." (citation omitted)). Fraudulent misrepresentation claims naturally turn

on the *content* of the allegedly deceptive statements, and it is well-settled that class treatment is inappropriate where material misrepresentations have not been made to the class as a whole. *See, e.g.*, *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068-69 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017); *infra* at 19-20.

Here, Plaintiffs cannot show falsity or materiality with class-wide, common proof. The crux of Plaintiffs' theory is that Meta's Potential Reach estimates were inflated because, although they were stated in terms of "people," they were actually "an estimate of 'accounts' reached," a number that differed from the number of "unique people" reached. Order 10. But, as the district court itself recognized, "the numerical value" of the "discrepancy between people and accounts . . . *varied across advertisers*." *Id.* (emphasis added).

Plaintiffs' own expert acknowledged that "inflation level" varies depending on the size of the group the advertiser chooses to target. *See* Cowan Expert Report ("Cowan") ¶ 135, ECF No. 282-8. This is because many of the "duplicate" accounts causing the alleged inflation actually reflect a user's different interests, behaviors, and demographics—for example, a user may have one account focused on work interests and a separate account focused on dogs. Depending on an advertiser's targeting criteria (*e.g.*, "dogs lovers"), a targeted Potential Reach estimate would include only one of those accounts. *See* Lobert ¶¶ 4-5, ECF No. 296-14; Tadelis

¶¶ 95-103. As the targeting criteria further narrow the ad's target audience, the alleged inflation thus decreases. *See* Tadelis ¶¶ 99, 102.

Indeed, Plaintiffs' own expert asserted that the level of inflation varied between class members by a *factor of five*—with inflation being as low as 10% for certain class members, and over 50% for others. *See* Cowan ¶¶ 131, 132, 135. Meanwhile, Meta's expert concluded that there was very little chance of 10% minimum inflation for more targeted ad campaigns, and indeed, inflation for many such campaigns was *de minimis*. Tadelis ¶¶ 99-102, 110-16, 124-31. Importantly, the district court did not resolve this "battle of the experts" in plaintiffs' favor, *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011), but rather found that because Meta's expert did "not conclude that *no* inflation occurred at all," the variation in the *amount* of inflation between class members was simply irrelevant. Order 11-12 (emphasis added).

In other words, the district court found that the claims of millions of advertisers could be tried on a class-wide basis, *regardless* of the concededly *different* levels of alleged inflation in the representations made to each advertiser. But, it is the amount of alleged inflation that drives liability in this case. Meta expressly described Potential Reach as an "estimate." Whether an estimate is materially misleading turns on how far that estimate departs from the "true" value. If the difference between "accounts" and "people" is *de minimis*, as Meta's expert

found was the case in some instances, then Plaintiffs cannot show *any* misrepresentation, because an "estimate" does not become false by virtue of being inexact. And even where the alleged inflation is more than *de minimis*, a misrepresentation is material only if a reasonable person "would attach importance" to it "in determining his [or her] choice of action." *Downey v. Pub. Storage, Inc.*, 44 Cal. App. 5th 1103, 1116 (2020) (alteration in original) (quoting *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 332-33 (2011); *Engalla*, 15 Cal. 4th at 977); *Tucker*, 208 Cal. App. 4th at 228. It is a fundamentally different inquiry to ask whether it is materially misleading to call an allegedly 5-10% inflated figure an "estimate" than it would be if that figure were 50% inflated. A jury's conclusion as to one simply would not establish liability as to the other. Accordingly, the only way to establish falsity and materiality for each of the different representations at issue would be to conduct individualized inquiries, class-member by class-member, to determine whether the unique representation they saw was materially misleading.

Moreover, even aside from differing levels of alleged inflation, advertisers in this class differ in at least three critical respects that render materiality impossible to prove on a class-wide basis. *First*, each advertiser saw Potential Reach alongside evolving disclosures that could affect how they understood the terms "estimate" and "people." For example, during the Class Period, Meta clarified that Potential Reach estimates could differ depending on "how many accounts are used per person," and

Meta later added additional explanations regarding duplicate and fake accounts. *See* Class Cert. Opp. 7 (describing changes to disclosures during Class Period). Those disclaimers go to the heart of Plaintiffs' claims, and they place class members in meaningfully different positions with respect to whether they were exposed to an allegedly material misrepresentation.

*Second*, advertisers had differing objectives for their ad campaigns. An advertiser paying by "conversion" (or click-through) will place different weight on Potential Reach than an advertiser whose objective is maximizing reach. Indeed, it is unclear why an advertiser whose objective is conversions would care about reach *at all*—placing those advertisers in an inherently different situation than those advertisers who purportedly relied on Potential Reach. *See, e.g.*, McDowell Decl. ¶¶ 5, 10 (explaining that he does not rely on Potential Reach to set his budget because his objective is conversions).

*Finally*, advertisers had access to—and considered—a range of different information in making their advertising decisions. For example, a smaller advertiser with a lower budget might disregard Potential Reach since their actual audience will never be close to the maximum number of people within a targeting set, and instead rely on Estimated Daily Results, which reflect the *actual* number of people expected to view an ad given the advertiser's budget. *See* Tucker ¶¶ 69-72. And an advertiser who has placed ads on Meta before, and thus has access to data tracking their results

in real-time, including actual impressions or clicks, will likewise attach very different weight to Potential Reach than a first-time user. *See id.* ¶¶ 8(e), 74-75 (majority of spending was by repeat advertisers). Similarly, an advertiser using an agency with industry experience and access to vast historical information about the performance of certain types of ads may place very different emphasis on an abstract estimate like Potential Reach, as compared to an advertiser without such sophisticated assistance. *See id.* ¶¶ 76-80 (explaining that many advertisers worked with ad agencies and consultants).

As other district courts have rightly found, such fundamental differences mean that an advertiser class exposed to different alleged misstatements simply cannot show that each class member "would attach materially similar significance" to the representations they viewed. *IntegrityMessageBoards.com v. Facebook, Inc. ("IMB")*, No. 18-cv-05286, 2021 WL 3771785, at *17 (N.D. Cal. Aug. 24, 2021) (holding that plaintiff could not show materiality by common proof where advertisers in the class "maintain[ed] different objectives"); *Singh v. Google LLC*, No. 16-cv-03734, 2022 WL 94985, at *12 (N.D. Cal. Jan. 10, 2022) (declining to certify class that "contain[ed] advertisers who [were] likely to have 'a degree of preexisting marketing experience' such that they would not all 'attach importance' to a 1-4% difference" in an advertising metric).

The district court's decision to certify a class notwithstanding these fundamental variations was manifest error. It is well-settled that there is "no cohesion among [class] members [who] were exposed to . . . disparate information." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011). This Court has repeatedly rejected class certification of fraud claims where putative class members were not uniformly exposed to a material misrepresentation. In *Berger*, for example, this Court affirmed the denial of class certification where determining whether class members were exposed to "a potentially misleading or deceptive statement" would require examination of individual contracts. 741 F.3d at 1069. And this Court did the same in *Reitman v. Champion Petfoods USA, Inc.*, where the plaintiffs' challenge to representations on dog food packaging would require an individualized inquiry into the additional information on each bag, as well as the specific formula used in each bag. 830 F. App'x 880, 881 (9th Cir. 2020). Certification simply is not appropriate where there have been no "uniform material misrepresentations," and where (as here) even determining "whether there were in fact *any* misrepresentations" to a given class member is itself an individual issue. *Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 851 (2009) (emphasis added); *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1094-95 (1993) (requiring

"the same material misrepresentations" be made "to each member of the class" (emphasis omitted)).[2]

The district court's explanation for why it disregarded the critical variation within the class does not withstand even minimal scrutiny. In a few conclusory sentences, the district court dismissed the differentiation based on the fact that "Potential Reach was always expressed as a number of 'people,'" and there was at least *some* discrepancy between the number of "people" and "accounts" as to all class members. Order 10. But, as discussed above, because Meta expressly described Potential Reach as an "estimate," it is the *size* of the "discrepancy between people and accounts" that drives whether any given statement was actually misleading. *Id.* And the mere fact that each estimate had the word "people" in it shows at most a common representation, not a common *mis*representation. Even if, as the district court asserted, Potential Reach were an "important" metric "shown to all advertisers," *id.*, that does not mean that *all* the *different* levels of inflation presented in the millions of separate statements at issue were materially misleading to each of the differently situated advertisers in the class.

---

[2] Of course, statements need not be "verbatim," and "'slight differences'" will not defeat certification. *In re First All. Mortg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006) (citation omitted). But the five-fold variation in the alleged inflation that Plaintiffs' own expert found is not a "slight difference" by any measure.

Moreover, even if falsity and materiality could somehow be established on a class-wide basis, Plaintiffs cannot "establish that damages are susceptible of measurement across the entire class," because they lack a model that would measure "only those damages attributable" to the theory the district court "accepted for class-action treatment." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013). The court granted Meta's *Daubert* motion to exclude McFarlane, and only McFarlane purported to present a damages model isolating damages caused by use of the term "people" instead of "accounts." Indeed, one of Plaintiffs' *other* experts found that changing the label would *not* impact class members' budget allocations. *See* Reibstein ¶ 119. Having (properly) excluded the only expert pertinent to Plaintiffs' "people" theory, the district court could not then certify a class based on the "people" statement. *Comcast*, 569 U.S. at 35, 37-38 (reversing certification because damages model was not limited to remaining theories).

## II. THE DISTRICT COURT'S DECISION IMPLICATES A FUNDAMENTAL AND UNSETTLED QUESTION OF CLASS ACTION LAW

Interlocutory review is warranted because the issues presented in this petition are recurring and unsettled in the district courts. While the case law regarding fraudulent representations has developed in traditional contexts (like billboards or labels) where the representation does not vary substantially between viewers, most modern advertising platforms create tailored representations based on an advertiser's

own criteria. District courts have struggled greatly to establish uniform standards governing whether, and in what circumstances, such individualized representations made to differently situated advertisers are amenable to class-wide treatment.

While the district court here granted certification, its decision conflicts with the approach of other courts faced with similar advertiser class actions. Those courts have denied certification both because the class was not uniformly exposed to a material misrepresentation and because differences among advertisers precluded proof of materiality on a class-wide basis—features that are equally present here.

With respect to the first issue, in *IMB*, the court denied certification of a class of Meta advertisers where—like here—plaintiff failed to show that "all advertisers viewed the same *specific* misrepresentation." 2021 WL 3771785, at *11. The court explained that it would need to assess countless different statements to determine whether each was actionable, and it would then need to "identify which advertisers viewed which description to show exposure" to a misrepresentation. *Id.* at *12, *14. Those individualized inquiries defeated predominance in *IMB*—and they are legally indistinguishable from the ones that should have defeated predominance in this case. Similarly, in *Singh*, the court denied certification of a class of advertisers challenging Google's assertion that its filters captured 10% of fraudulent clicks, because, among other things, Google presented evidence that efficacy of the filter "varie[d] for each ad campaign and thus each advertiser." 2022 WL 94985, at *5, *10-12.

Determining whether the 10% figure was a misrepresentation would therefore require "compar[ing] the experience of each advertiser to the average rate claimed by Google." *Id.* at *5; *see also dotStrategy, Co. v. Facebook, Inc.*, No. 20-00170, 2021 WL 2550391, at *9 (N.D. Cal. June 22, 2021) (denying certification of class of Meta advertisers where there was "no evidence of class-wide exposure to the alleged misrepresentations"). The district court's decision to certify a class in this case notwithstanding the differing representations to which class members were exposed breaks sharply with those decisions.

With respect to the second issue, *IMB* and *Singh* both concluded that certification was not appropriate because the advertisers were so differently situated in terms of objectives, experience, and understanding that materiality could not be proven on a class-wide basis. In *IMB*, the court found that differences between the Meta advertisers—largely the *same* advertisers with the *same* differences at issue here—precluded certification, because determining materiality would have required individualized inquiries in light of advertisers' differing objectives and "prior knowledge, experience, and expectations." 2021 WL 3771785, at *17. And in *Singh*, the court similarly noted that "the varying levels of advertising sophistication in [the] class" precluded certification, because many of the advertisers were likely to have "'a degree of preexisting marketing experience'" that would prevent them from being misled by Google's statements. 2022 WL 94985, at *8, *12 (citation omitted).

Additionally, plaintiff challenged Google's statements and omissions regarding "the *average* efficacy of its click filters," but advertisers "had access to the *actual* efficacy of the click filters" for each of their own campaigns. *Id.* at *12. Accordingly, Google's alleged omissions would not be "material to a reasonable advertiser" with access to more concrete and reliable metrics. *Id.* The facts in *Singh* are strikingly similar to the facts here, where repeat advertisers have access to real time, historical data about the actual performance of their ads and are thus likely to place little weight on the representations plaintiffs challenge.

In other words, when faced with similar issues of variation within the class, district courts have repeatedly reached different conclusions. And this Court has not yet addressed whether the individualized representations often made to online advertisers with respect to their own particular ad campaigns are amenable to class-wide treatment. That issue is frequently recurring and exceptionally important. The proposed classes in these cases are expansive, implicating the interests of millions of people and the functioning of the online advertising ecosystem. *See, e.g.*, *IMB*, 2021 WL 3771785, at *16 (2.5 million class members); *Singh*, 2022 WL 94985, at *1 (describing class as "expansive"). The divergence of authority among the district courts, on this issue of great importance, warrants this Court's review.

## III. FAILURE TO GRANT THIS PETITION WOULD BE THE DEATH-KNELL OF THIS LITIGATION

Finally, interlocutory review is necessary because "the damages claimed" in this case may well force Meta to "settle without relation to the merits of the class's claims." *Chamberlan*, 402 F.3d at 960 (citation omitted). Plaintiffs seek to certify a class that is over *double* the size of the class in *Wal-Mart Stores, Inc. v. Dukes*, which the Supreme Court called "one of the most expansive class actions ever." 564 U.S. 338, 342 (2011) (describing class of 1.5 million plaintiffs). Plaintiffs have also claimed stunning damages of over *$7 billion*. *See* McFarlane Expert Report ¶ 28, ECF No. 282-74. Claimed damages in that amount almost never proceed to trial before a jury, meaning that the district court's fundamental errors will likely elude this Court's review. Moreover, because litigation of this nature will likely always involve damages sufficiently high to create inexorable settlement pressure, this Court will rarely, if ever, have the opportunity to address these critically important issues after final judgment. Interlocutory review is thus the only plausible path for this Court to provide badly needed guidance in this area of exceptional importance.

## CONCLUSION

The petition should be granted.

Dated: April 12, 2022

Respectfully submitted,


*/s/ Andrew B. Clubok*

Andrew B. Clubok
Susan E. Engel
Margaret A. Upshaw
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2200
andrew.clubok@lw.com

Elizabeth L. Deeley
Melanie M. Blunschi
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111

Samir Deger-Sen
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020

*Counsel for Petitioner-Defendant Meta Platforms, Inc.*

## CERTIFICATE OF COMPLIANCE

I certify that this Petition For Permission To Appeal Class Certification Decision Pursuant to Federal Rule of Civil Procedure 23(f) complies with the type-volume limitation of Circuit Rules 5-2(b) and 32-3(2), because the document contains 5,535 words, excluding portions exempted under Federal Rules of Appellate Procedure 5(b)(1)(E) and 32(f).

*/s/ Andrew B. Clubok*
Andrew B. Clubok

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of April, 2022, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, and caused a copy of the foregoing Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f) to be electronically served via email on the following:

Eric Alfred Kafka
Cohen Milstein Sellers Toll PLLC
88 Pine Street, 14th Floor
New York, NY 10005
(212) 838-7797
ekafka@cohenmilstein.com

Charles P. Reichmann
Law Offices of Charles Reichman
16 Yale Circle
Kensington, CA 94708
(415) 373-8849
charles.reichmann@gmail.com

Geoffrey A. Graber
Andrew N. Friedman
Karina Puttieva
Paul M. Stephan
Cohen Milstein Sellers & Toll PLLC
1100 New York Avenue, NW
Suite 500, West Tower
Washington, DC 20005
(202) 408-4600
ggraber@cohenmilstein.com
afriedman@cohenmilstein.com
kputtieva@cohenmilstein.com
pstephan@cohenmilstein.com

*Counsel for DZ Reserve and Cain Maxwell*

*/s/ Andrew B. Clubok*
Andrew B. Clubok

*Counsel for Petitioner-Defendant*
*Meta Platforms, Inc.*

ATTACHMENT

Pursuant to Federal Rule of Appellate Procedure 5(b)(1)(E)

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DZ RESERVE, et al.,

Plaintiffs,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 3:18-cv-04978-JD

**ORDER RE MOTION TO CERTIFY CLASS AND *DAUBERT* MOTIONS**

Re: Dkt. Nos. 282, 285, 286

In this action alleging fraud against Meta Platforms, Inc. (Meta), formerly known as Facebook, named plaintiffs DZ Reserve and Cain Maxwell have asked to certify a class of United States residents who paid Meta for placement of advertisements on social media platforms. Dkt. No. 282. The gravamen of the lawsuit is that Meta inflated its potential advertising reach to consumers, and charged artificially high premiums for ad placements. Meta opposes certification, and filed two *Daubert* motions challenging the opinions and conclusions proffered by plaintiffs' expert witnesses. Dkt. Nos. 285, 286.

Three claims alleged in the Third Amended Complaint (TAC) remain in play. Dkt. No. 332.[1] The Court dismissed with prejudice plaintiffs' claims for breach of the implied covenant of good faith and fair dealing and a quasi-contract claim. Dkt. No. 255 at 2. The Court sustained plaintiffs' claims for fraudulent misrepresentation and fraudulent concealment, with the proviso that plaintiffs could not pursue those claims for conduct before August 15, 2015. *Id*. at 1-2. While the certification motion was pending, the Court granted a motion for judgment on the

[1] The TAC was originally filed under seal as Dkt. No. 166. The Court denied the administrative motion to seal the TAC without prejudice, *see* Dkt. No. 320, and the TAC was refiled as Dkt. No. 332.

pleadings and dismissed plaintiffs' claim of restitution under the California Unfair Competition Law (UCL). Dkt. No. 366. The UCL claim was sustained for injunctive relief only. *Id*. at 2. Consequently, the claims subject to certification are fraudulent misrepresentation and fraudulent concealment for damages, and the UCL for injunctive relief.

## DISCUSSION

### I. BACKRGOUND

Before getting into the merits, a few words about Meta's brief are in order. Meta fired a blunderbuss of objections at certification. Virtually every page of its lengthy opposition brief presented a new argument, often in just a paragraph or two of discussion. As a result, many of its arguments were underdeveloped to the point where the Court had ample justification to disregard them. Even so, the Court undertook the burden of sorting through Meta's brief to identify and address what appear to be its main arguments. Meta aggravated this situation further by making factual arguments much more suited to summary judgment proceedings than a class certification motion. To be sure, as the ensuing certification standards make clear, the Court will review the evidence as pertinent to the question of whether a class should certified. Meta's arguments went far beyond that inquiry.

The parties' familiarity with the record is assumed. In pertinent part, the undisputed facts are that Meta sells advertising to businesses and business owners like plaintiffs DZ Reserve and Cain Maxwell. Dkt. No. 332 at ¶ 2 Meta's Ads Manager platform is used by advertisers to identify their advertising targets, including the demographic reach they desire. *Id*. at ¶ 3. After advertisers select their targeting and placement criteria, the Ads Manager displays a "Potential Reach" for the advertisement. *See* Dkt. No. 282-3. The Potential Reach is expressed as a number of people that the ad may reach. *Id*. The default Potential Reach number, before any targeting criteria are selected, is the Potential Reach for people in the United States aged 18 and up, which was shown during the putative class period to be over 200 million people. Dkt. No. 281-9 at ¶¶ 55-60. As targeting criteria are selected, the Potential Reach is revised accordingly. Dkt. No. 282-3; 281-13 at 54:21-59:25. Meta describes the Potential Reach as an estimate of people in the ad's target audience. *See* Dkt. No. 296-17 at 3.

## II. CLASS CERFITICATION STANDARDS

Plaintiffs propose to certify this class under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3):

> All United States residents (including natural persons and incorporated entities) who, from August 15, 2014, to the present ("Class Period"), paid for the placement of at least one advertisement on Facebook's platforms, including the Facebook and Instagram platforms, which was purchased through Facebook's Ads Manager or Power Editor.
>
> Excluded from the class are: (1) advertisements purchased pursuant to agreements other than Facebook's Terms of Service or Statement of Rights and Responsibilities; (2) advertisements purchased using only non-lookalike Custom Audiences as the targeting criteria; (3) advertisements purchased using Reach and Frequency buying; (4) advertisements purchased with the objectives of canvas app engagement, canvas app installs, offer claims, event responses, page likes, or external; and (5) advertisements for which Facebook provided Potential Reach lower than 1000.

Dkt. No. 282 at 15.

The Court has written extensively on the standards for class certification, which informs the discussion here. *See, e.g.*, *Sapan v. Yelp, Inc.*, No. 18-cv-3240-JD, 2021 WL 5302908 (N.D. Cal. Nov. 15, 2021); *Meek v. SkyWest, Inc.*, --- F. Supp. 3d ---, 2021 WL 4461180 (N.D. Cal. Sep. 29, 2021). A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotations omitted). The overall goal is "to select the metho[d] best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 460 (2013) (internal quotations omitted) (modification in original). Plaintiffs must show that their proposed class satisfies all four requirements of Rule 23(a), and at least one of the subsections of Rule 23(b). *Comcast*, 569 U.S. at 33 (2013); *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001). As the parties seeking certification, plaintiffs bear the burden of showing that the requirements of Rule 23 are met for their proposed class. *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

The Court's class certification analysis "must be rigorous and may entail some overlap with the merits of the plaintiff's underlying claim," but merits questions may be considered only

United States District Court
Northern District of California

to the extent that they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 568 U.S. at 465-66 (internal quotations and citations omitted). The class certification procedure is decidedly not an alternative form of summary judgment or an occasion to hold a mini-trial on the merits. *Alcantar v. Hobart Service*, 800 F.3d 1047, 1053 (9th Cir. 2015). The decision of whether to certify a class is entrusted to the sound discretion of the district court. *Zinser*, 253 F.3d at 1186.

## III. RULE 23(B)(3) CLASS

The Rule 23(a) factors are the same for certification of the proposed class under Rule 23(b)(2) or (b)(3), and the conclusions reached here for the Rule 23(a) elements apply to both types of classes. The main difference is the predominance element of Rule 23(b)(3), which Rule 23(b)(2) does not require. The Court takes up the proposed Rule 23(b)(3) class first.

The Court granted Meta's motion for judgment on the pleadings to dismiss plaintiffs' UCL claims for restitution, *see* Dkt. No. 366, so monetary relief is only available for plaintiffs' common law fraudulent concealment and fraudulent misrepresentation claims.

### A. Numerosity (23(a)(1))

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs state, with evidentiary support, that "[d]uring each year of the class period, more than 2 million United States advertisers purchased Facebook ads." Dkt. No. 282 at 15. Meta does not contest numerosity, and the Court finds this element is satisfied.

### B. Typicality and Adequacy (23(a)(3)-(4))

Rule 23(a) requires the named plaintiffs to demonstrate that their claims are typical of the putative class, and that they are capable of fairly and adequately protecting the interests of the class. Fed. R. Civ. P. 23(a)(3)-(4). The named plaintiffs say typicality is satisfied because they "bring the same legal claims as the rest of the putative [c]lass" and "rely on the same grounds for liability as the rest of the class." Dkt. No. 282 at 17. Plaintiffs also say that they are adequate representatives because "[t]hey have no conflicts with the class," have "participated actively in

this case," and their counsel has no conflicts, has experience with class actions, and has demonstrated a "willingness to vigorously prosecute this action." *Id*.

Meta makes multiple objections to adequacy and typicality. The primary one is that the proposed class is said to include a diverse population of advertisers ranging from "'large sophisticated corporations' to 'individuals and small businesses.'" Dkt. No. 294 at 16-17. In Meta's view, this means that the putative class members are necessarily in such disparate positions vis-à-vis its advertising services that the named plaintiffs, as advertisers on the smaller end of the spectrum, cannot fairly or adequately represent them. *Id*.

The objection is not well taken. To start, typicality is demonstrated when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." (internal quotation marks omitted). *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1019.

That is the situation here. Plaintiffs have adduced evidence indicating that, regardless of size or buying power, Meta's customers saw similar representations by Meta about its advertising reach and programs. Advertisers were shown the same default Potential Reach of over 200 million people before they applied any targeting criteria. Dkt. No. 281-9 at ¶¶ 55-60. Plaintiffs' expert, Dr. Charles Cowan, states that even with different targeting criteria for each advertiser, inflated Potential Reach representations were made across Meta's platform. Dkt. No. 281-11 at ¶ 33. All advertising customers were shown Potential Reach estimates that were inflated by a similar percentage. *Id*. at ¶ 15.[2]

[2] Dr. Cowan's work is discussed in more detail later in the order.

It may be that class members differ in advertising budgets and scope of purchases, as Meta suggests, but Meta has not shown that these differences defeat typicality or the named plaintiffs' ability to adequately represent all class members. This is not a case where the record demonstrates that the products, pricing, and programs accessed by class members were so dissimilar that typicality and adequacy could not be established. *See, e.g.*, *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 489-90 (N.D. Cal. 2008) (denying certification of antitrust class where evidence demonstrated putative class members purchased entirely different products at different prices). In effect, Meta simply posits that typicality and adequacy cannot be established because the class includes large and small ad purchasers. The problem with this approach is that it is *ipse dixit* and not an evidence-based objection.

Meta's case citations do not lead to a different conclusion. It overreads *In re Facebook, Inc., PPC Advertising Litig.*, 282 F.R.D. 446 (N.D. Cal. 2012)*, aff'd sub nom. Fox Test Prep v. Facebook, Inc.*, 588 F. App'x 733 (9th Cir. 2014), to stand for the proposition that a "'diverse group' of advertisers" necessarily undercuts adequacy and typicality. Dkt. No. 293-4 at 16-17. But that case in fact determined that typicality had been demonstrated. *In re Facebook, Inc.*,, 282 F.R.D. at 453-54. Adequacy was not found because the record failed to show that the named plaintiffs had suffered a concrete injury from the challenged conduct. *Id*. at 454. That is not a circumstance present here.

Meta also has not demonstrated an evidence-based reason to reject the adequacy of the named plaintiffs generally. Adequacy of representation asks whether: "(1) the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Meta did not make a serious effort at answering either inquiry in the negative, and plaintiffs have demonstrated that no such concerns are in play here. *See* Dkt. No. 282 at 16-17.

Meta's effort to recast its typicality and adequacy challenges as questions of reliance and UCL standing is equally unavailing. *See* Dkt. No. 294 at 15. To start, named plaintiffs demonstrated reliance by proffering evidence that DZ Reserve was deterred from using Meta ads

after learning that the Potential Reach was an inaccurate metric. Dkt. No. 293-27 at 193:17-194:5. Similarly, named plaintiff Maxwell relied on Potential Reach to set his budgets and would not have spent money on Meta ads if he knew Potential Reach was inaccurate. *See* Dkt. No. 293-29 at 199:8-12; Dkt. No. 317-2 at 257:3-14. Meta says that the named plaintiffs would still have purchased ads if they knew the Potential Reach was inaccurate. Dkt. No. 294 at 16. But plaintiffs also indicated that they would have spent less on ads after learning the Potential Reach was inaccurate, demonstrating that they were deceived into spending more money. *See, e.g.*, Dkt. No. 317-3 at 105:21-106:5. This and similar evidence also establishes reliance for UCL standing purposes. *See Walker v. Life Insurance Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020) ("To bring a UCL claim, a plaintiff must establish he suffered 'as a result of' the defendant's conduct.") (quoting Cal. Bus. & Prof. Code § 17204); *In re Tobacco II Cases*, 46 Cal. 4th 298, 325 (Cal. 2009) (named plaintiffs, not absent ones, must provide evidence of actual reliance at the certification stage).

Meta's mention of an arbitration provision in contracts for advertising after May 2018, Dkt. No. 294 at 17, also does not defeat the adequacy and typicality of the named plaintiffs. The complaint in this case was filed in August 2018. Dkt. No. 1. Despite that, and knowing of the arbitration clause and its possible application to plaintiffs, Meta never sought to compel arbitration, and instead vigorously litigated this lawsuit in federal court as if arbitration were not an option. A good argument can be made that Meta has waived arbitration on this record. *See Anderson v. Starbucks Corp.*, No. 20-cv-01178-JD, 2022 WL 797014 (N.D. Cal. March 16, 2022) (and cases cited therein). In addition, the record shows that the named plaintiffs purchased ads before and after May 2018, which indicates that they are adequate representatives for advertisers who purchased ads both before and after May 28, 2018. *See* Dkt. No 328-2 at ¶ 21. If for some presently unknown reason an adjustment to the class definition might be required on arbitration grounds, the Court can alter or amend it at any time before entry of a final judgment. Fed. R. Civ. P. 23(c)(1)(C); *see also Powers v. Hamilton Cty. Pub. Def. Com'n*, 501 F.3d 592, 619 (6th Cir. 2007).

Plaintiffs have satisfied the elements of adequacy and typicality.

**C. Commonality (23(a)(2)) and Predominance (23(b)(3)**

The commonality requirement under Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Because "any competently crafted class complaint literally raises common questions," the Court's task is to look for a common contention "capable of classwide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Alcantar*, 800 F.3d at 1052 (internal quotations and citations omitted). What matters is the "capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Dukes*, 564 U.S. at 350 (internal quotations omitted) (emphasis in original). This does not require total uniformity across a class. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019. "[E]ven a single common question will do." *Dukes*, 564 U.S. at 359. The commonality standard imposed by Rule 23(a)(2) is "rigorous." *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 512 (9th Cir. 2013).

Rule 23(b)(3) sets out the related but nonetheless distinct requirement that the common questions of law or fact predominate over the individual ones. This inquiry focuses on whether the "common questions present a significant aspect of the case and [if] they can be resolved for all members of the class in a single adjudication." *Hanlon*, 150 F.3d at 1022 (internal quotations and citation omitted); *see also Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016). Each element of a claim need not be susceptible to classwide proof, *Amgen*, 568 U.S. at 468-69, and the "important questions apt to drive the resolution of the litigation are given more weight in the predominance analysis over individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). Rule 23(b)(3) permits certification when "one or more of the central issues in the action are common to the class and can be said to predominate, . . . even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson*, 577 U.S. at 453 (internal quotations omitted).

United States District Court
Northern District of California

"Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a)," *Comcast*, 569 U.S. at 34, and the main concern under subsection (b)(3) is "the balance between individual and common issues." *In re Hyundai and Kia Fuel Economy Litigation*, 926 F.3d 539, 560 (9th Cir. 2019) (en banc) (internal quotations omitted). The Court finds it appropriate to assess commonality and predominance in tandem, with a careful eye toward ensuring that the specific requirements of each are fully satisfied. *See, e.g.*, *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1120-21 (9th Cir. 2017).

**1. Liability**

Plaintiffs have demonstrated that the main liability issues are common to the class members and are capable of resolution with common evidence. For the fraudulent concealment and fraudulent misrepresentation claims, plaintiffs must show: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e. to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997). For plaintiffs' UCL claims (for which only commonality must be shown as part of the 23(a) factors, given the unavailability of monetary relief), plaintiffs must show that members of the public were likely to be deceived. *Williams v. Gerber Products Co.*, 552 F.3d 934, 938 (9th Cir. 2008) (claims under UCL and CLRA are "governed by the 'reasonable consumer' test"; plaintiffs "must show that members of the public are likely to be deceived") (internal quotations and citations omitted).

Consequently, the main liability question is the same for all class members: did Meta's Potential Reach metric mislead advertisers? Meta does not disagree, and instead hurls a grab bag of challenges to plaintiffs' ability of proving an answer in their favor. Much of Meta's argument against commonality and predominance is simply that the evidence does not support plaintiffs' case. That is not the pertinent inquiry at the certification stage. The question is whether it makes sense under Rule 23 and as a matter of due process and efficiency to present the liability dispute to a jury on behalf of a class. Whether plaintiffs can ultimately prove it up at trial is a different matter altogether.

United States District Court
Northern District of California

To the extent a merits inquiry is warranted, plaintiffs have adduced evidence showing that all class members were exposed to a similar representation about the ability of Potential Reach to reach "people," namely unique individuals. *See, e.g.*, Dkt. No. 282-3; Dkt. No. 281-9 at ¶¶ 55-60. This is seen in the Ads Manager interface, which represented Potential Reach as a number of people. *See, e.g.*, Dkt. No. 281-8. The evidence further shows that Meta's Potential Reach metric was not actually an estimate of people reached, but an estimate of "accounts" reached. *See* Dkt. No. 281-60 at ECF 10. Because the number of unique accounts and unique people were different, this led to an inaccurate representation of how many people the advertisements could reach. *See* Dkt. No. 281-11 at ¶ 15.

Meta does not dispute that the Potential Reach numbers were presented in terms of people. Instead, Meta says that the Potential Reach numbers were not uniformly inaccurate as a result of different targeting criteria producing different Potential Reach numbers. Dkt. No. 293-4 at 18-20. Even so, Potential Reach was always expressed as a number of "people," and the discrepancy between people and accounts made the number inaccurate, even if the numerical value of the inaccuracy varied across advertisers. Consequently, plaintiffs have shown that the question of whether Meta made misrepresentations to all class members can be shown through common evidence.

Meta's knowledge of the misleading statements, and intent to deceive, also lend themselves to resolution by common evidence. *See, e.g., Brickman v. Fitbit, Inc.*, No. 15-cv-2077-JD, 2017 WL 5569827, at *6 (N.D. Cal. Nov. 20, 2017) (citing *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 173-74 (2003)). Several documents show that Meta knew that its Potential Reach estimate did not accurately reflect the number of people its advertisements could reach. *See* Dkt. No. 281-25; Dkt. No. 281-27. Meta's intent for advertisers to rely on its Potential Reach numbers is also provable through common evidence. Meta knew that the potential reach number was the most important number in its ads creation interface and that advertisers frequently relied on the estimated audience to build their budgets and advertising strategies. Dkt. No. 281-8.

So too for materiality and reliance. In common law and UCL fraud cases, questions of materiality and reliance do not necessarily undermine predominance and commonality. *Brickman*,

2017 WL 5569827, at *6-*7; *Milan v. Clif Bar & Co.*, No. 18-cv-2354-JD, 2021 WL 4427427, at *5 (N.D. Cal. Sep. 27, 2021). "[A] presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Tobacco II Cases*, 46 Cal. 4th at 327. A misrepresentation is material "if a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id.* (internal quotations omitted). The question of materiality "can be proved through evidence common to the class." *Amgen*, 568 U.S. at 467. Plaintiffs have established that materiality and reliance can be shown in this case through common evidence. Potential Reach metrics were shown to all advertisers in the Ads Manager. Dkt. No. 282-3; Dkt. No. 282-4. Meta has acknowledged that Potential Reach is an important number for advertisers. Dkt. No. 281-8. A majority of advertisers rely on Potential Reach as a metric for their advertisements. Dkt. No. 281-22.

Plaintiffs have also established that proof of injury is susceptible to common evidence. Among other evidence, a report from Pivotal Research showed that Potential Reach numbers exceeded census counts for various demographics, Dkt. No. 282-22 and several internal documents indicated various causes of inflated Potential Reach levels, *see, e.g.*, Dkt. No. 282-28; 282-7; 282-31; 282-32. Plaintiffs' expert, Dr. Cowan, conducted a statistical analysis to determine the percentage of inflation for both nationwide and targeted advertisements. *See* Dkt. No. 282-8. He concluded that it was a statistical certainty that, for any advertisement with a Potential Reach of at least 1,000 people or more, the estimate would be significantly inflated above the actual number of people the advertisement could reach. *Id.*

Meta says that Dr. Cowan improperly assumed that the inflated estimates found in the default national population (United States, aged 18-65) Potential Reach were equally applicable across all targeted groups, and that each measure of inflation was distributed across targeted groups. Dkt. No. 281-11 ¶ 82. Meta's expert, Dr. Steven Tadelis, says that this is a flawed assumption because Meta's data sampling shows that sources of inflation are not distributed evenly across all smaller demographics that an advertiser might choose. Dkt. No. 293-44 ¶ 125. But Dr. Tadelis does not conclude that no inflation occurred at all, only that Dr. Cowan did not

measure the exact inflation resulting from any given targeting criteria because inflation for any given sub population may be different from the inflation for the default national population. This criticism does not foreclose classwide proof of injury.

**2. Damages and *Daubert* Motions re Dr. Allenby and Mr. McFarlane**

While a damages methodology need not deliver mathematical precision, and may accommodate some individual variability among class members, *see In re Capacitors Antitrust Litigation*, No. 17-md-2801-JD, 2018 WL 5980139, at *9 (N.D. Cal. Nov. 14, 2018), it must be capable of determining damages across the class in a reasonably accurate fashion. *Comcast*, 569 U.S. at 35 (plaintiffs bear burden of showing that "damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)"). The damages model "must measure only those damages attributable to" the plaintiffs' theory of liability. *Id.* Put plainly, the damages model must reasonably reflect the claims and evidence in the case.

Plaintiffs have proffered experts who analyzed the evidence to arrive at a price premium that advertisers paid for inflated Potential Reach values. Dkt. No. 281-3 at 21. Dr. Cowan measured the amount of inflation associated with Potential Reach as a result of the misleading "people" metric. *Id.* Dr. Allenby used a "conjoint survey" to test the impact of inflated Potential Reach on advertisers' budgets. *Id.* Dr. Roughgarden, an auction expert, calculated a price premium. *Id.* Dr. Levy, an economist, confirmed that Dr. Roughgarden's price premium properly considered supply and demand, and that damages could be calculated on a classwide basis. *Id.* Plaintiffs also offer expert witness Mr. McFarlane, who opined about the price premium class members paid compared to if no potential reach metric was provided at all. *Id.*

Meta offers little in its class certification brief to attack plaintiffs' damages models. It relies instead on two separately filed *Daubert* motions to exclude the opinions of Dr. Allenby and Mr. McFarlane, and by extension, the portions of Dr. Levy and Dr. Roughgarden's opinions that rely on the reports of Dr. Allenby and Mr. McFarlane. Dkt. Nos. 284-4, 284-6.

Overall, Meta has not demonstrated a good reason to exclude Dr. Allenby's work. Under the familiar standards of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), there is no "definitive checklist or test" used to

evaluate the reliability of proposed expert testimony. *Daubert*, 509 U.S. at 593-94. The question for the Court at this stage is to decide whether Dr. Allenby will use a generally accepted method for determining price premiums, or whether his approach is "junk science" akin to predicting criminality by feeling the bumps on a person's head. *General Electric Co. v. Joiner*, 522 U.S. 136, 153 n.6 (1997) (Stevens, J., concurring in part).

The "inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." *Sali v. Corona Reg'l Med. Ctr.*, 9-9 F.3d 996, 1006 (9th Cir. 2018). The Court determines whether the expert evidence helps to establish whether class certification is appropriate. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011).

Dr. Allenby conducted a conjoint survey and analyzed the data using both a linear regression model and a "logit model" (another type of statistical analysis) before determining that the logit model did not best fit the data. Meta does not suggest that a conjoint survey is an untested method, nor does it claim that it is improper to use a linear regression to analyze survey data. Rather, Meta says that the specific regression that Dr. Allenby used was a novel type of analysis that purposely excluded data from the analysis. Dkt. No. 284-4 at 10-12.

This Court has found conjoint analysis to be a reliable method of determining price premiums. *See, e.g.*, *Milan v. Clif Bar & Co.*, No. 18-cv-2354-JD, 2021 WL 4467427, at * 7 (N.D. Cal. Sep. 27, 2021). Meta does not dispute the generally utility of conjoint analysis, and focuses its critique on Dr. Allenby's use of a linear regression model to analyze the data from the conjoint survey. Dkt. No. 284-4 at 10. Plaintiffs have shown that Dr. Allenby chose a linear regression model that is a standard method for analyzing this data. Dkt. No. 304-17 at 143:9-18; 304-20 at 57:23-58:7. Dr. Allenby's choice of one particular data analysis method over another goes to the weight of his opinion, not its admissibility. *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010). To the extent that Meta suggests that Dr. Allenby improperly limited his data set, this too is a question of weight to be afforded to the opinion, not its admissibility. *In re Capacitors Antitrust Litig.*, No. 17-md-2801-JD, 2018 WL 5980139, at *6 (N.D. Cal. Nov. 14, 2018). Dr. Allenby states that he chose a subset of the data to

United States District Court
Northern District of California

analyze based on the fact that his conjoint survey included allocations of advertising for both Meta and Google ads, but only Meta ads are at issue in this case. Dkt. No. 304-17 at 288:10-289:8.

This is enough to be sound and useful for certification purposes. If evidence emerges at trial that substantially impeaches Dr. Allenby's methods and conclusions, the door may be opened to consideration of decertification.

Meta's objections to Mr. McFarlane's report lead to a different outcome. Meta says that Mr. McFarlane offered nothing more than his personal interpretation of documents and evidence. Dkt. No. 284-6 at 7. Meta also says that Mr. McFarlane used a price premium figure that he did not calculate, and merely applied it in an obvious fashion to the amount of money plaintiffs are said to have spent on advertising. *Id*. at 3.

These objections are well taken. Overall, Mr. McFarlane's report does not offer any specialized or scientific expertise, or anything beyond the typical knowledge and experience of a jury. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592. The documents Mr. McFarlane interprets are reasonably intelligible to a jury without special assistance. Consequently, exclusion of Mr. McFarlane's opinions and report is required. Any portion of Dr. Roughgarden's opinions that is drawn on Mr. McFarlane's work is also excluded, unless an independent basis for it is demonstrated. The Court declines to undertake that analysis on the record as it currently stands. Meta may pursue it in a motion in limine, as circumstances warrant.

Because plaintiffs have adequately shown that they can calculate damages on a classwide basis using Dr. Allenby's report and evidence from their other experts (excluding Mr. McFarlane), they have shown an adequate damages model under Rule 23(b)(3).

### D. Superiority

The final certification question is whether the ends of justice and efficiency are served by certification. Rule 23(b)(3) requires a finding that proceeding as a class is superior to other ways of adjudicating the controversy, which in this case would mean individual actions by each putative class member. There can be no doubt here that a class is the superior method of handling the claims of individual advertisers. The price premium at issue here for each advertiser is no more than $32, Dkt. No. 281-3, and it is not likely for class members to recover large amounts

individually if they prevailed. No reasonable person is likely to pursue these claims on his or her own, especially given the cost and other resources required to litigate against a company like Meta, which has already retained multiple experts and shown that it is committed to strongly defending this case. This all "vividly points to the need for class treatment." *Just Film*, 847 F.3d at 1123.

**IV. RULE 23(B)(2) CLASS**

Plaintiffs seek certification of a class under Rule 23(b)(2) for the UCL injunctive relief claim. Such a class may be certified when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Class certification under Rule 23(b)(2) is appropriate only where the primary relief sought is declaratory or injunctive." *Zinser*, 253 F.3d at 1195. The primary use of Rule 23(b)(2) classes has been the certification of civil rights class actions, but courts have certified many different kinds of classes under Rule 23(b)(2). *See Parsons v. Ryan*, 754 F.3d 657, 686 (9th Cir. 2014). The Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy must also be shown for a Rule 23(b)(2) class. *Zinser*, 253 F.3d at 186. As discussed, plaintiffs have met their burden for proving the Rule 23(a) requirements.

For Rule 23(b)(2), the Court is not required "to examine the viability or bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125 (9th Cir. 2010). "It is sufficient to meet the requirements of Rule 23(b)(2) that class members complain of a pattern or practice that is generally applicable to the class as a whole." *Id.* (quoting *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)) (internal quotations omitted).

The California Supreme Court has held that "[i]njunctions are the 'primary form of relief available under the UCL to protect consumers from unfair business practices." *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 337 (2011); *see also Tobacco Cases II*, 46 Cal. 4th at 319. For the proposed Rule 23(b)(2) class, plaintiffs seek injunctive relief in the form of an order directing

Meta to "either (a) correct the [Potential Reach] metric by removing known sources of inflation, or (b) remove the [Potential Reach] metric altogether." Dkt. No. 281-3 at 18.

Plaintiffs have standing to seek an injunction. As our circuit has determined, "a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase," because "[k]nowledge that the advertisement or label was false in the past does not equate to knowledge that it will remain false in the future." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018). Plaintiffs have proffered deposition testimony to the effect that they would consider purchasing ads from Meta again if Meta corrected or removed the misleading Potential Reach metric. Dkt. No. 282-65 at 242:18-23; Dkt. No. 282-64 at 105:24-106:5. This establishes plaintiffs' standing to pursue injunctive relief in this case.

Meta's arguments to the contrary are unavailing. To start, Meta repeats the same arguments that it already made in its motion for judgment on the pleadings, Dkt. No. 270, that plaintiffs have failed to show they lack an adequate remedy at law. The Court has already determined that plaintiffs have shown an inadequate remedy at law for their injunctive relief claim under the UCL. Dkt. No. 366 at 2.

Meta also says that plaintiffs did not show they face a threat of actual future harm because at least one inflation source has already been remediated and Meta updated disclosures about multiple accounts. Dkt. No. 293-4 at 25. This is a merits question that is not properly decided at the class certification stage.

Meta's passing comment that the injunction plaintiffs seek is "overbroad and unworkable," Dkt. No. 293-4 at 25, is no basis for denying certification. The remark was not developed in a meaningful way, and concerns about the scope of an inunction are premature at this stage. *See B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957, 972 (9th Cir. 2019). There is considerably more to be done in this case, namely trial, before the specific terms of an injunction might warrant debate.

Consequently, a Rule 23(b)(2) class is appropriate for plaintiffs' UCL claims.

United States District Court
Northern District of California

**CONCLUSION**

The Court certifies the proposed class under Rule 23(b)(3) for the common law fraud claims, and under Rule 23(b)(2) for the UCL injunction claim. Plaintiffs DZ Reserve, Inc. and Cain Maxwell are appointed class representatives, and their counsel at Cohen Milstein Sellers & Toll PLLC and the Law Offices of Charles Reichmann are appointed class counsel.

Meta's motion to exclude the report and testimony of Dr. Allenby is denied. Meta's motion to exclude the report and testimony of Mr. McFarlane is granted.

Plaintiffs are directed to file by April 29, 2022, a proposed plan for dissemination of notice to the classes. Plaintiffs will meet and confer with Meta at least 10 days in advance of filing the plan so that the proposal can be submitted on a joint basis, to the fullest extent possible.

A status conference is set for May 26, 2022, at 10:00 a.m. in Courtroom 11, 19th Floor, San Francisco. The parties are directed to file a joint statement by May 19, 2022, with proposed dates for the final pretrial conference and trial.

The parties are referred to Magistrate Judge Hixson for a settlement conference to be held as his schedule permits.

**IT IS SO ORDERED.**

Dated: March 29, 2022

JAMES DONATO
United States District Judge